the act of 1848, by exacting, as a mode of proof of the authenticity of the papers, the certificate of the minister, or consular officer of the United States in the foreign country, that they are verified as required by this act. But this does not repeal or alter the act of 1848, authorizing the admission of papers, "certified under the hand of the person or persons issuing such warrant, and attested by the oath of the party producing them, that they are true copies." It merely provides another mode of authenticating the papers, additional to that provided by the act of 1848.

And it is worthy of notice on this point, as showing the intention of the governments of Great Britain and the United States as to the character of the evidence to be received in the hearing of these extradition cases, that the second section of the act of parliament of August 22, 1843, passed the next year after the ratification of the treaty between the two governments, is identical with some provisions of the second section of the act of congress of 1848, enacted five years after the passage of the British statute. The latter statute provides, in express words, "that copies of the depositions upon which the original warrant was granted, certified under the hand of the person or persons issuing such warrant, and attested upon the oath of the party producing them to be true copies of the original depositions, may be received in evidence of the criminality of the person so apprehended." From this, it is a fair inference that congress had the British statute before them in framing and passing the act of 1848, and intended a perfect reciprocity between that and the British statute, as to the mode of proof. Nor can it be doubted that both governments are mutually bound to recognize the obligations of the laws of the other, in cases of applications for the rendition of fugitives; and the judges or magistrates of each must admit evidence authenticated as required by the statute of the country, in behalf of which the rendition is sought.

There are other points of exception to these proceedings, exceedingly technical in their character, to which I have not thought it necessary to advert. The only questions needing consideration are those relating to the jurisdiction of the judge and the admissibility of the evidence offered. These being disposed of, I shall not expand this opinion by other and unimportant considerations.

It may be well, perhaps, to remind the counsel for the accused that the action of the court in the present proceeding is not conclusive upon him. If it shall be held to be necessary to remit him to his native country, to answer to the criminal charge against him, he will there have a full opportunity of defense before a jury, and will only be found guilty upon clear and legal proof.

It is understood that counsel for the accused desire, upon the overruling of the exceptions urged, to introduce evidence in his defense, negativing the charge of criminality against him. The opportunity to do so will, of course, be freely granted.

The prisoner cut his throat and died, pending a further hearing of the case.

---

## Case No. 12,070.

ROSS v. The ACTIVE.

[See Case No. 12,071.]

---

## Case No. 12,071.

ROSS v. The ACTIVE.

[2 Wash. C. C. 226.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1808.

SHIPPING — MASTER — POWER TO BIND SHIP — TO SELL CARGO—GENERAL AVERAGE—ORDINARY DECAY.

1. Regularly, the master is the agent of the ship owner only, and has nothing to do with the cargo, but for its safe keeping and transportation. The supra-cargo represents the owner of the cargo, and has nothing to do with the ship.

2. The master has full powers to bind the ship owner for the money he may borrow for the necessary purposes in a foreign country, where the owner is not present, and where the loan is exclusively for the interest of the owner, and if it cannot be obtained upon bills drawn on the owner, which he is bound to pay, he may pledge the ship, to repay the loan with maritime interest.

[Cited in Burke v. The M. P. Rich, Case No. 2,161.]

3. If the owner of the ship is also owner of the cargo, the master may sell part of the cargo, to raise money for necessary wants of the ship, and, if in no other manner the money can be obtained, and the loan is absolutely required for the success of the voyage, he may sell a part of the cargo of the ship, to whomsoever it may belong.

[Cited in Bank of St. Thomas v. The Julia Blake, 107 U. S. 427, 2 Sup. Ct. 699.]

4. If the owner of the cargo is on board of a vessel, at the time of a disaster requiring that money shall be obtained by the master to enable the vessel to prosecute the voyage, he is not bound to advance funds, and if he does so, he is entitled to satisfactory security, and an extra and adequate compensation for the advance.

5. Such contracts will, however, be at all times carefully scrutinized, as the master may be more exposed to imposition in making them, than in a loan from a stranger.

6. Where, in the course of a voyage, a ship from ordinary decay requires to be repaired at an immediate port, the expenses of such repairs are not the subject of general average.

7. General average is incurred where the expenses or losses arose in a case of emergency, not produced by the misconduct or unskilfulness of the master, and not resulting from the ordinary circumstances of the voyage.

[Cited in The Ontario, 37 Fed. 222.]
[Cited in Hause v. New Orleans M. & F. Ins. Co., 10 La. 1.]

[Appeal from the district court of the United States for the district of Pennsylvania.]

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]